## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 19-cr-636 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| ANTHONY RUCKER | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant's motion to suppress [25] is denied.

### I.    Background

Defendant Anthony Rucker filed a motion to suppress evidence from what he contends was an unlawful search of a residence at 937 North Harding in Chicago on May 21, 2019. The Court has taken extensive briefing [29, 42, 45, 48, 57, 58], heard oral argument [49], and convened an evidentiary hearing [55]. Three of the four Chicago police officers who encountered Rucker on that day testified at the hearing. In addition, the parties submitted video evidence from the body-worn cameras of three officers, as well as a video taken at a later time to show the layout of the residence.

The testimony establishes that the four Chicago police officers set up surveillance near the 900 block of North Harding Avenue, in Chicago, between Iowa Street to the south and Augusta Boulevard to the north. Two officers, Goss and Dohnal, were on foot, while two others, Sweezer and Zeman, remained in an unmarked car. Officers Goss and Dohnal observed Rucker engage in what they believed to be hand-to-hand narcotics transactions in front of the residence located at 937 North Harding and relayed their observations to Officers Zeman and Sweezer over the radio.

After the second suspect narcotic transaction, Officers Zeman and Sweezer drove toward Rucker's location. As they approached, they observed Rucker engage in another transaction with

the driver of an orange Dodge Charger that was stopped in the middle of the street. As Zeman and Sweezer closed-in on the location of the transaction, they observed a heavy weighted object in Rucker's front right hoodie or jacket pocket. Based on their training and experience, the officers suspected that object to be a gun. The officers were familiar with Rucker and knew that he was a convicted felon and thus not legally permitted to possess a firearm. As the officers approached to within 15 feet of Rucker, he began to walk away toward the residence at 937 North Harding, which the officers knew to be Rucker's mother's residence. Officers Zeman parked the vehicle and the two officers followed Rucker toward the residence, with Officer Sweezer in the lead.

Officer Sweezer observed Rucker holding his right hand to his right side, where Officers Sweezer and Zeman had seen the heavy object. Rucker continued through the front exterior fence, up the front porch stairs, and into the residence. Sweezer was about five feet behind Rucker as he entered the residence. The door that Rucker entered when he went into the residence was a screen/spring door with a glass window that Officer Sweezer was able to see through, giving him a partial view into the living room. There also was a second main door to the residence that Rucker left open. After Rucker entered the residence, he locked the screen/spring door by turning the knob on the door, and then took one to two steps into the residence. Officer Sweezer testified that he was able to see into the residence through a glass window and saw Rucker remove a gun from his right hooded sweatshirt pocket and toss it into the right side of the living room. From his position at the door, Officer Sweezer was unable to see where the gun landed. Sweezer also claimed to have observed three young children inside the living room—one on the couch, one towards the front of the living room, and a third who came into the living room from an adjacent hallway—each of whom were within a couple feet of the location where Sweezer believed the firearm had been tossed. Sweezer observed no other adults in the house at the time besides Rucker.

Officer Sweezer then had a brief conversation with Rucker, telling Rucker to open the door. Rucker complied and shortly thereafter Sweezer asked Officer Zeman to handcuff Rucker. Sweezer then advised Zeman that Rucker had thrown a firearm onto the floor of the residence and asked Zeman to retrieve it. After handcuffing Rucker and leaving him to be escorted out of the residence by Sweezer, Zeman recovered a firearm from on top of a pile of clothes on a small couch/armchair located within the living room, approximately five to six feet from the front door. When he entered the residence to recover the firearm, Officer Zeman also observed two children. Officer Zeman did not observe any other adults besides Rucker until after the gun was recovered, at which time Rucker's mother appeared from what looked to be a back room of the residence. While he was in the house, Officer Zeman did not go into or search any location other than the area of the living room where the firearm was located and recovered and promptly exited after picking up the firearm.

## II. Discussion

The legal issues implicated by this motion focus on multiple aspects of Fourth Amendment jurisprudence. First, did the officers have reasonable suspicion to conduct an investigatory stop of Rucker? Second, did exigent circumstances justify Officer Zeman's warrantless entry into and limited search of the residence to recover the weapon? Third, if exigent circumstances did not exist, should the motion to suppress nonetheless be denied under the inevitable discovery doctrine? As explained below, the Court concludes that the first two questions can be answered in the affirmative; thus, it need not address the third one.

### A. Reasonable Suspicion to Conduct a *Terry* Stop

In *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968), the Supreme Court defined an "investigative stop" as "a brief detention, which gives officers a chance to verify (or dispel) well-founded

suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States v. Bullock*, 632 F.3d 1004, 1014-15 (7th Cir. 2011). "An investigatory stop complies with the Fourth Amendment if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015). In assessing the propriety of an investigatory stop, courts look to "(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts." *Bullock*, 632 F.3d at 1012. "Reasonable suspicion is a lower threshold than probable cause and does not deal with hard certainties, but with probabilities. It requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Id*.

Here, the credible testimony of the officers establishes multiple reasons for "reasonable suspicion" that Rucker had committed a crime during the officers' surveillance. All four officers testified that they had observed Rucker engage in what they reasonably believed were hand-to-hand narcotics transactions in the street. Officers Sweezer and Zeman also testified that they observed a heavy weighted object in Rucker's right sweatshirt pocket, which they believed to be a firearm based on their training and experience. Finally, Sweezer testified that as Rucker entered the residence and locked the screen/spring door, he removed a gun from his sweatshirt pocket and tossed the gun into the right side of the living room. To add more context to these observations, the officers further testified that, based on previous interactions, they knew that Rucker was a convicted felon. These facts taken as a whole provided ample reason to suspect that Rucker had been involved in narcotics sales and illegally possessed a firearm and thus justified the initial investigatory stop.

**B.      Exigent Circumstances to Recover the Firearm.**

Although warrantless searches of areas entitled to Fourth Amendment protection are presumptively unreasonable, law enforcement officers may overcome this presumption by demonstrating that "exigent circumstances require[d] officers to 'step in to prevent serious injury and restore order.'" *United States v. Haldorson*, 941 F.3d 284, 294-95 (7th Cir. 2019) (citing *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010)).   Exigent circumstances can include a threat to the safety of law enforcement or the general public, as well as a threat of the imminent destruction of evidence.  *Id.*  The test is whether "an officer had an objectively reasonable belief that there was a compelling need to act and no time to obtain a warrant."  *Id.* (citing *Huddleston*, 593 F.3d at 600).   The Seventh Circuit has observed that the safety of others is a particular concern when police respond to a report of a crime in progress, and police judgments regarding warrantless entries "should be afforded an extra degree of deference" in those circumstances.  *Reardon v. Wroan*, 811 F.2d 1025, 1029 (7th Cir. 1987).   Furthermore, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *United States v. Richmond*, 924 F.3d 404, 417 (7th Cir. 2019) (concluding that exigent circumstances justified warrantless seizure of a handgun from the threshold of the defendant's residence during an encounter on his porch where officers reasonably believed that the defendant may lunge toward what the officers suspected was a gun, and unknown duplex occupants might access the gun by opening the front door and picking it up off the threshold (citing *Kentucky v. King*, 563 U.S. 452, 466 (2011))).

In objecting to the suggestion that exigent circumstances justified the search for and seizure of the firearm, Rucker focuses chiefly on what he considers to be "inconsistencies and

contradictions" in the testimony of the two key officers, Sweezer and Zeman. He notes discrepancies between what the officers wrote in their reports and said to the grand jury and what they focused on in their testimony before this Court.

Rucker is not incorrect in pointing out these inconsistencies. The Court's review of the police reports, grand jury testimony, and evidence presented in this case shows a common shortcoming in police reporting. Police reports are often written hurriedly and with poor attention to detail. They often focus only on the facts needed to support the arrest and charging decision, seemingly without regard to any justifications for seizing evidence at the time of the arrest. This is short-sighted and can lead to understandable skepticism on the part of defense counsel and courts. Well trained officers ought to be able to complete a report with all of these aspects of policing in mind. The reports of the incident in question here fall short in a few obvious respects. For example, the police report states that the firearm was "laying on the floor," testimony that is contradicted by Officer Zeman's recollection that he recovered the firearm from a couch. Rucker also notes that neither the police reports nor the officers' grand jury testimony mentions encountering any children at the residence. Again, this may not have been an important detail to support Rucker's arrest and the bringing of charges against him, but it turns out to be pivotal to the Government's argument that the search and recovery of the weapon were lawful. These shortcomings provide an understandable basis for Rucker to suggest that the presence of children at the scene was not significant to the officers at the time of the search but has now been injected into the case as a post hoc justification.

At the same time, another relatively new tool in police work—the body-worn camera— provides the parties, the Court, and the public with an important window into what the officers saw and knew at the time that they seized the weapon in question. In particular, Officer Zeman's

body-worn camera confirms that young children were in fact on the scene within seconds of Rucker retreating into the residence with the officer in hot pursuit. Rucker suggests that Sweezer could not have seen the tossing of a gun, but the rest of the evidence supports Sweezer's testimony. Perhaps it was a lucky guess that a loaded firearm would be found within ten feet of the door to the residence, but the far more likely scenario is that multiple officers did see a heavy-weighted object in Rucker's possession outside the residence and that Sweezer did see Rucker toss the gun and also saw the general direction in which it was thrown. This explains Sweezer's request that Zeman recover the gun, Sweezer's description of the location where it could be found, and Zeman's rapid collection of the gun in the precise area he was told to search.

Of course, that recovery still could be unlawful in the absence of exigent circumstances. But this is where the undisputed presence of the children, backed by the officers' testimony and confirmed by the camera images, renders Zeman's actions reasonable and lawful. It may be an unfortunate fortuity for Rucker that he retreated into a home where young children were present. Had there been no children present—or if the children had been playing in the backyard—then the search probably would have been unlawful absent a warrant. But the children plainly were in close proximity to the weapon and they appeared in view and earshot of the officers before Rucker's mother did, leaving the officers to face a snap decision whether to recover a weapon or risk it falling into the hands of apparently unsupervised minors. In fact, Officer Zeman's body-worn camera footage shows a child almost immediately inside the front door as he turns to walk in the direction of where the weapon was recovered, a second child asleep on the couch immediately adjacent to the chair where the gun was found, and a third child who comes into view as Zeman is exiting after picking up the gun. The suggestion that the officers should not have acted to secure the weapon because they did not know whether it was loaded or even operational is not well-taken;

that was not a risk that a reasonable officer can afford to take, as the opportunities for second-guessing would be rife if one of the children had picked up the weapon before it was recovered by a responsible adult. This is precisely the kind of "split-second judgment" that the Seventh Circuit upheld in *Richmond*, 924 F.3d at 417, and the presence of multiple young children on the scene made the decision to recover the gun even more pressing that the circumstances present in *Richmond*.

Finally, the officers certainly did not plant the children on the scene to provide a pretext for gaining access to the residence, so this is not a "police-created exigency" prohibited under *Kentucky v. King*, 563 U.S. 452 (2011). The presence of the children at the residence was almost certainly known to Rucker, although he would not have known exactly where they were at the time he scrambled back to the house trying to stay a step ahead of the police and separate himself from the firearm he surely understood he was not allowed to possess. In short, to the extent that someone created the exigency of an attended loaded semi-automatic handgun in close proximity to three young children, it was Rucker, not the officers.

In sum, the Court concludes that the clear and undisputed presence of minor children in close proximity to an unattended semi-automatic firearm justified Officer Zeman's warrantless search for and seizure of the firearm under the exigent circumstances doctrine, and that Zeman's intrusion into the residence lasted no longer than necessary and was strictly limited to the location where the gun was believed to have been thrown (and from which it was in fact recovered).[1]

---

[1] In view of that conclusion, the Court need not consider the Government's further contentions in support of the seizure – including that (1) other occupants of the home, including defendant's mother who the officers knew to live in the residence, might access the gun by walking into the living room where defendant discarded it; (2) the unknown male on the front porch might enter the residence and access the gun; and (3) although handcuffed, Rucker might have broken free from law enforcement, retreated back into the residence, and retrieved the gun. Nor is it necessary to consider the Government's final argument that the firearm would have been inevitably discovered by lawful means—namely, by obtaining a search warrant.

Dated: May 18, 2021

                                               _____

                                               Robert M. Dow, Jr.
                                               United States District Judge